# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-00713-SCT

*RICKEY PORTIS a/k/a RICKY C. PORTIS a/ka*
*RICKY PORTIS*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 04/25/2016 |
| TRIAL JUDGE: | HON. DAL WILLIAMSON |
| TRIAL COURT ATTORNEYS: | KRISTEN E. MARTIN |
| | GAY L. POLK-PAYTON |
| | JEANNENE PACIFIC |
| | DENNIS LEE BISNETTE |
| | PATRICK LANCE PACIFIC |
| | BRAD RODRICK THOMPSON |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KAYLYN HAVRILLA McCLINTON |
| DISTRICT ATTORNEY: | ANTHONY J. BUCKLEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/14/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE KITCHENS, P.J., KING AND COLEMAN, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     Rickey Portis was convicted of two counts of sexual battery based on allegations that

he repeatedly abused his then eight- and nine-year-old stepdaughters, Amy and Mary

Collins.[1]  The trial court sentenced him to two life sentences, to run consecutively.  Portis appeals his convictions, arguing that the trial court erred by refusing to grant a continuance, that the trial court erred by failing to allow him to introduce a prior inconsistent statement of a prosecution witness, that the verdict is not supported by sufficient evidence, that the verdict is against the overwhelming weight of the evidence, that cumulative error requires reversal, and that Portis's sentences are disproportionate to the crime.  Because the trial court did not commit reversible error, this Court affirms Portis's convictions and sentences.

**FACTS**

¶2.     Amy and Mary lived with their mother, Dee Smith, their younger maternal half-brother, and their stepfather, Rickey Portis.  They frequently visited the home of their father, John Collins, and stepmother, Ramona Collins.  They were also close to their oldest paternal half-sister, Mandy Clark.  In February 2015, one or both of the girls told Ramona that Portis had touched Amy.  Ramona informed Mandy.  On February 21, 2015, Mandy took Amy, Mary, and their younger half-brother to Dairy Queen.  She took Amy and Mary to the restroom and asked them if anyone had been touching them.  Mary encouraged Amy to tell Mandy and Amy got upset; Amy and Mary then told Mandy that Portis had been touching Amy inappropriately.  Amy had been afraid to tell anyone because she was afraid she would be in trouble.  Mandy reported this information to Dee when she returned the girls, and then took the girls to their father's house.

¶3.     At trial, Mandy testified that Mary told her that Portis also touched her, but on cross-

---

[1]This Court uses fictitious names for the children and most of their adult relatives in order to protect the identities of the minor children.

2

examination, she was confronted with her original statement to police, in which she stated that Mary had told her that Portis did not touch her. Mandy stated that "[i]t's not in [the statement to police], but she told me."[2]

¶4. John reported Amy's allegations to Deputy Richard Stockman of the Jones County Sheriff's Department. Deputy Stockman contacted the investigator on call, Sergeant Tonya Madison. Sergeant Madison met with Amy and Mary on February 23, 2015. Amy told Sergeant Madison that Portis had touched her inappropriately. Mary told Sergeant Madison that Portis had not touched her, but that she had witnessed Portis trying to get Amy in his bed. On March 2, 2015, Sergeant Madison took both girls for a forensic interview at Wesley House in Meridian.

¶5. Olga Kahle, a mental health therapist with Wesley House who has a Ph.D. in psychology and is a Diplomat Level Child Forensic Interviewer,[3] interviewed Amy and Mary separately on March 2, 2015, according to the Child First Forensic Interviewing Protocol. The protocol requires the interviewer "to be non-biased, objective, and neutral" and prohibits the use of "any leading or suggestive questions." The protocol has four stages: 1) "build a rapport with the child[,]" 2) "seeking information from the child[,]" 3) "getting clarification and getting some formal questions in[,]" and 4) "closure." Both interviews were videotaped.[4]

---

[2]On cross-examination, Mandy was confronted with several different portions of her statement to police, with defense counsel often quoting from the statement.

[3]This is the highest level of certification for a child forensic interviewer, and only three people in Mississippi are at that level.

[4]The videotapes were shown to the jury at trial.

In Amy's interview, she described that Portis placed his penis and fingers in her vagina, anus, and mouth on multiple occasions. She marked the areas on pictures, and she demonstrated the acts with dolls. Mary described some of the events happening to Amy and also demonstrated what occurred with dolls. Kahle concluded that the reports from the girls "are consistent with that of a child who has been sexually abused." She clarified on cross-examination that the interviews were consistent with Amy being sexually abused, and Mary witnessing that abuse. She also stated that just because a child does not disclose abuse does not mean nothing happened; sometimes it simply means that they cannot disclose the abuse for various reasons.

¶6. On March 3, 2015, Amy and Mary went to the Child Safe Center at University of Mississippi Medical Center (UMMC) for medical examination. One of the nurse practitioners examined them, and Dr. Scott Benton, the medical director of the Child Safe Center, reviewed the medical findings and reports and testified at Portis's trial. Dr. Benton is an expert in child abuse pediatrics, formerly known as pediatric forensic medicine. He testified that, at the time of trial, he was the only doctor in Mississippi certified in pediatric forensic medicine.

¶7. Dr. Benton testified that Amy's physical examination was normal. Dr. Benton testified at length that the majority (eighty to ninety-five percent) of girls who have been previously sexually abused have a normal physical examination. He noted that "particularly the longer you get from when the last incident was[,] the chance of the body being normal is much higher." He noted that "if it's a person who knows the child, [they] are gentle

because they know they're going to get discovered if they cause injury. Even in cases where there is injury[,] a child can heal and heals very well." He stated that "[i]t's a common myth . . . that you could look at a child and tell if they've been sexually abused. Only in a small number is that true." On cross-examination, he clarified that no injury may exist because

> at eight and nine years of age with adequate lubrication you can take an adult male penis and penetrate a child that age. The youngest age that I've seen was about five years of age. Again, it just requires the person to be cooperative and there to be sufficient lubrication and you can stick fairly large things into a child this [age]. They're right to the cusp of puberty, both of them. And that is possible.

He further noted that if an injury occurs, it is not likely to be one that scars. He noted that the hymen and vagina, if injured, can heal in a week or two, usually without any scar. He clarified that

> these are all myths that were mostly perpetrated by men to make you think that you can look at a woman and tell if they've had sex or not. There are certain occasions of assault or sex or consensual sex that can cause injury that leaves a scar, but the majority of the time it doesn't.

Defense counsel continued asking questions regarding injury and scarring, so he used the example that almost everyone at some point in their lives has bitten the inside of their cheek and caused an injury. He noted that most people would never have a scar from biting their cheek, because the lining of the mouth heals so well, as "[i]t's designed to take the trauma of biting and injury." He stated that the lining of the mouth is the same as the lining in the vagina, and is called mucosal tissue. He used the example that

> [i]f I go to you now and look inside your mouth and say I don't see a scar, you've never been injured in your mouth, I would be a bad doctor because you have. Same thing if I look at a little girl's vagina or her hymen and I see normal today, it doesn't mean that a week ago or two weeks ago or a month

5

ago that there wasn't an injury or an ulcer of a disease or something else where I would have said you've been sexually abused.

After this answer, defense counsel continued to question him regarding injury, and he replied

the point is not what happens when we see it. It's what do we say when we don't see it. If I look in your mouth and I think that it's normal and I don't see any bruising, trauma, bleeding, injury to the soft pallet [sic] penetrating back to the esophagus, these are all things that I can see. If I don't see it[,] I don't look at you and say, you have never injured your mouth. That's not scientific. I know it not to be true any more than I can look at a little girl[']s anus or vagina or hymen, see that it's normal and say, you've never been penetrated[,] you've never had sexual contact[,] because that's not scientifically true or accurate.

¶8. The clinic also tested Amy for HIV, syphilis, gonorrhea, and chlamydia, and all of those tests were negative. Mary also tested negative for HIV, syphilis, gonorrhea, and chlamydia. Her physical exam did not reveal any genital injury, but it did reveal white vaginal discharge. The discharge was tested, and a test for trichomoniasis vaginalis was added. The trichomoniasis test was positive. Amy then returned to the Safe Center on March 12, 2015, to be tested for trichomoniasis. That test was also positive. Dr. Benton testified that trichomoniasis vaginalis is a parasite that is sexually transmitted. It is not symptomatic in most people. In his report on Mary, Dr. Benton stated that "[f]inding this infection in a child is definitive of sexual abuse by intimate contact with infected secretions." In Amy's report, Dr. Benton stated that "[f]inding this infection in a child is suggestive of sexual abuse by intimate contact with infected secretions." At trial, Dr. Benton concluded that, to a reasonable degree of medical certainty, the exam of each of the girls was consistent with having been sexually abused.

¶9. On cross-examination, defense counsel pushed the issue of the trichomoniasis, asking

6

if a person can contract trichomoniasis in other ways. Dr. Benton noted that with all sexually transmitted diseases (STDs), a person can contract it in three ways: 1) when you pass through the birth canal, a mother can pass the infection to the child; 2) sexual contact; and 3) nosocomial. He explained that trichomoniasis "in particular is not a very viable organism outside of humans infected." He explained the third method of transmission as a theory that if some infected secretions land "on say a toilet seat or other place" and "if you were to go rub your private parts on that infected secretion that had been left usually not more than about 10 minutes previously you might be able to transmit it." He also acknowledged a few studies showing that trichomoniasis can survive in mineral hot springs, but averred that no evidence exists that it has infected anyone through hot springs. He stated that co-bathing in the home is not a source for infection of trichomoniasis. He also noted that the longest that he knew of a birth infection of trichomoniasis to be present without detection was nine months. Upon further cross-examination, Dr. Benton explained "[s]he was way beyond birth. I m[e]an, we have eight and nine year olds here. This is not a birth infection." Regarding nosocomial transmission, or "the toilet seat type of thing," he noted that

> [w]e don't have a way to experimentally say yea or nay. So I need to [be] honest with you that it's out there as a potential mechanism, but it would have to happen quick. I mean, that someone ejaculates and maybe it's on their hand or whatnot and somehow it gets to a place where another person [sic]. I can think of very few situations where that's not sexual in nature and contact.

He concluded that "it's my opinion, and the opinion of the American Academy of Pediatrics, the Center[] for Disease Control, that the finding of trich is sexual abuse in almost all cases."

¶10.   Dr. Benton also explained in detail that many children do not report sexual abuse

7

immediately. He stated that a failure to report occurs for three broad reasons: 1) naivety (assuming what happens is acceptable); 2) external factors, such as threats and bribes; and 3) internal factors, such as guilt, embarrassment, fear, post-traumatic stress disorder, and depression. He also testified that when children do report sexual abuse, they often do not disclose or describe it the same way every time they tell the story.

¶11. Based on the positive STD results for Mary, Sergeant Madison spoke with Mary again on March 10, 2015. Mary told Sergeant Madison that Portis did not touch her, but that she would write Sergeant Madison a note and leave it on her desk. The note stated "Dear, Mrs. Tonya Madison Ricky tried to touch me, but I told my step dad no, and he tried to touch in the bathroom when I was using the bathroom. Please do not show no one, Please Sincerely, [Mary Collins]."

¶12. On April 6, 2015, a search warrant was issued for Portis's urine. Sergeant Madison took Portis to LabCorp, where his urine was collected. LabCorp tested his urine for trichomoniasis, and the result was positive. Donna Vestal, the manager of molecular microbiology and virology at LabCorp, testified that she reviews the testing of urine specimens. She testified that Portis's test for trichomoniasis was positive.

¶13. Tabitha Walls, a mental health counselor treating the girls, testified about their current counseling. She used a method called trauma focus cognitive behavioral therapy (TFCBT). She had been seeing the girls for almost a year, beginning in May 2015, and had seen them each between fifteen and twenty times during that period. The steps of TFCBT are as follows: first, they go through the psychoeducation about sexual abuse, which is generally

talking about appropriate versus inappropriate touch, as well as post-traumatic stress disorder; second, they move on to mastering relaxation skills; third, they learn effective expression; fourth, they learn cognitive coping skills; and fifth, they move to the "trauma narrative," which is when the children begin to tell the story of what occurred. Walls stated that the girls had not told her the story of what occurred yet because they were only at the beginning of the trauma narrative stage and "we have only spent one session on that which is simply what happened before the trauma began, like good things in their life to get them comfortable with telling the story."

¶14. Amy and Mary both testified live via closed-circuit television, with one of Portis's attorneys in the room with them, and the other allowed to communicate with her from the courtroom.[5] Both girls testified that Portis had touched them inappropriately, and that no one else had ever touched them inappropriately. Amy testified that Portis penetrated her "private part" with his fingers and his "private part." Mary testified that Ricky put his "privacy" in her "butt."

¶15. Portis called Dee, the girls' mother, in his defense, and also testified in his own defense. Dee testified that at first she did not believe the allegations against Portis because she had put her trust in her husband. She also testified that Portis had been married twice before marrying her, and had had stepchildren in those marriages. She stated that she reversed course and believed the allegations when she found out that she and both girls had an STD. She further testified that she knew "for a fact" that the STD they had could be

---

[5]The determination to allow the girls to testify via closed-circuit television was made after a lengthy hearing on the issue.

spread only vaginally or anally. She testified that she knew this based on her work in the medical field as a CNA. She also testified that she had "[n]o doubt" that Amy and Mary were sexually abused by Portis.

¶16. Portis testified that he did not abuse Amy and Mary. When asked if he knew if anyone would have a reason to accuse him of these crimes if they weren't true, he responded

> I mean, at the time when all this was happening, me and my wife and my sister and my mother and her mother was putting it together like their baby daddy wanted to get me out the house for some reason or other. He supposed to be getting a settlement or something like this here and he supposed to be paying child support. He had an accident back in I think 2010, something like that. I guess that settlement was supposed to have been coming along, something like that. And that's what she was saying.

He further testified that "we all figured that's what he wanted me out of the house for because when they took my kids, they just took our kids and didn't bring them back home at all, so. And that's what happened." Portis's explanation for how the girls contracted an STD was "[w]ell, the doctor was – I don't know nothing about sex – I ain't never had a disease in my life, so I don't know." He further opined that they contracted trichomoniasis from their mother at birth.

## PROCEDURAL HISTORY

¶17. Portis was indicted for two counts of sexual battery on May 8, 2015. He retained Jeannene Pacific as defense counsel. After some continuances, trial was scheduled for April 5, 2016. On March 22, 2016, Pacific filed her first motion to withdraw as counsel. The motion stated:

> . . . [C]ounsel has spent an enormous amount of time and effort in investigation, review, [m]eetings with both ADA Kristen Martin, and

10

Investigator Tonya Madison. That the medical [i]n this cause has been challenging due to both minors and defendant, Portis, having tested [p]ositive for the same STD.

Counsel has repeatedly told Portis and his family that she believed the chances of Portis being convicted were great and has been in plea negotiations with the D.A.'s Office [f]or some time and has conveyed those results to the defendant.

Counsel has lost all ability to communicate with defendant Portis, as whatever she [t]ells him is met with some off the wall reasoning about some secret deal that he believes Investigator Madison made with the lab who tested Portis for the STD; and also that God was going to take care of him.

Anything further about the actual trial of this case has been met with irrational [r]esponses.

Counsel met again on this date with Ricky Portis and presented him the latest [p]lea offer and again was met with irrational words and notions. . . .

Since the meeting earlier today, counsel has been notified that Portis, his mother, and [h]is sister have cursed counsel, called her the worst of the worst names, all being recorded [o]n the phone system at the Jones County Jail (RECORDINGS AVAILABLE FOR REVIEW)[.]

. . . [S]he . . . cannot proceed with preparations for trial [w]hen she firmly believes that she is subjecting this defendant to potentially 2 life sentences [i]f convicted.

. . .

The court denied the motion and appointed assistant public defender Brad Thompson to assist Pacific with the trial.

¶18. On March 23, 2016, the State moved the court to allow hearsay statements of Amy and Mary into evidence under the tender years exception, and moved for the use of closed circuit television for the children's testimony.

¶19. On March 30, 2016, Pacific filed a renewal of her motion to withdraw as counsel, which Thompson joined. Portis represented to Pacific and Thompson that he had retained Gay Polk-Payton as counsel and he refused to consider the plea proposal of ten years that Pacific and Thompson presented him, informing them that Polk-Payton had advised him not

11

to sign anything. Polk-Payton advised Pacific that she had not yet been retained, but the attorney sign-in book at the jail revealed that Polk-Payton had visited with Portis. Pacific renewed her motion based on the grounds in her previous motion, as well as due to the "situation of a client who is listening to the advice of another Attorney who is not involved in the case. This situation presents a totally unworkable predicament for counsel to go forward with a trial wherein the penalty is life in prison [i]f convicted."

¶20. On April 1, 2016, Polk-Payton entered her appearance in the case. She also requested a continuance and some discovery. The court denied the motion for continuance, and ordered Pacific and Thompson to "immediately provide all discovery" to Polk-Payton. It further directed Pacific and Thompson to assist Polk-Payton "in the preparation and assignment of trial responsibilities, if desired by Hon. Polk-Payton." Polk-Payton filed a motion to reconsider the order denying the continuance, due to her inadequate time to prepare for trial and the fact that no witness list was provided to her. The motion stated that "the Defense is not asking the Court for months of preparation time and would be more than ready to try this case at the court's earliest possible convenience after April 15 due to scheduling conflicts caused by Defense Counsel's duties as a Forrest Justice Court Judge that were not mentioned in the previous motion." At the hearing on the matter, the defense represented that the motion for a continuance was not a delay tactic, stating

> We're just asking for a little more time. Not months. I'm not asking for months. I'm asking for a couple of weeks if the Court's calendar would allow for that. I'm not asking for the Court to delay this until the fall or anything like that. We're ready to get this over.

Polk-Payton also stated that Pacific had been helpful to her and would assist at trial, while

12

acknowledging that problems had arisen with communication between Pacific and Portis. Pacific also represented that she knew the case "backward and forward" and had assisted and would continue to assist Polk-Payton. The State did not object to a short continuance and defense counsel stated that the State "mentioned the 18th. That's absolutely fine with me if it pleases the Court." The court granted this motion, and reset the trial for April 18, 2016. The court also granted the State's motion on the tender years hearsay exception and closed circuit television testimony.

¶21. During the State's case at trial, after Mandy had concluded her testimony and other witnesses had testified, Portis moved to recall Mandy. Portis asked to recall her only "for purposes of introducing her written statement, her sworn statement to the Jones County Sheriff's Department" due to the inconsistencies in Mandy's testimony with that statement. The requested recall was for impeachment purposes only. The court noted that cross-examination regarding the statement had not been limited, and that Portis could have attempted to introduce the statement on cross-examination. Portis had not subpoenaed Mandy for his case-in-chief. Portis's counsel represented that she did not introduce the statement because "[w]hen we were up there I was looking for her statement. I was going through my paperwork, but I was trying to press on and move on so that the jury wouldn't have to sit there and wait for me because I found - - ." She claimed it was due to a "good faith effort on my part to move on." The State claimed that the statement was inadmissible. The court denied the request for recall, because Mandy had admitted making the prior inconsistent statement, citing caselaw and Mississippi Rule of Evidence 613(b).

13

¶22. The jury ultimately found Portis guilty on both counts. The court sentenced him to two life sentences, to run consecutively. Portis filed a motion for judgment notwithstanding the verdict (JNOV), or in the alternative, motion for a new trial. The trial court denied his motion, and Portis appealed to this Court. He raises the following issues: 1) whether the trial court erred in refusing to grant a continuance; 2) whether the trial court erred in denying Portis's request to recall Mandy and introduce her prior inconsistent statement; 3) whether insufficient evidence to convict Portis existed; 4) whether the verdict was against the overwhelming weight of the evidence; 5) whether cumulative error deprived Portis of his right to a fair trial; and 6) whether Portis's sentences constitute cruel and unusual punishment.

## ANALYSIS

### 1. Continuance

¶23. Whether to grant or deny a continuance is a decision left to the sound discretion of the trial court, and this Court should not reverse the denial of a continuance absent manifest injustice. *Lambert v. State*, 654 So. 2d 17, 22 (Miss. 1995); Miss. Code Ann. § 99-15-29 (Rev. 2015) ("A denial of the continuance shall not be ground for reversal unless the supreme court shall be satisfied that injustice resulted therefrom."). "The burden of showing manifest injustice is not satisfied by conclusory arguments alone, rather the defendant is required to 'show concrete facts that demonstrate the particular prejudice to the defense.'" *Stack v. State*, 860 So. 2d 687, 691-92 (Miss. 2003) (quoting *Burns v. State*, 729 So. 2d 203, 213 (Miss. 1998), *abrogated on other grounds*).

14

¶24. Portis claims that the defense was "forced" into the April 18, 2016, trial date. He claims this deprived him of the right to have a prepared attorney, deprived him of the means to argue his theory of the case, and deprived him of the ability to secure out-of-state witnesses. Portis does not identify these witnesses or proffer their testimony. He also argues that a longer continuance would have allowed trial counsel to realize "the depth of animosity between Portis and co-counsel."

¶25. Portis's argument that a thirteen-day continuance was "forced" misrepresents the facts, as it is completely belied by the record. Indeed, Portis asked for this trial date and agreed to it. Even the post-trial motions admit that the continuance was not forced on the defense, stating that replacement counsel did not fully understand the case at the time of the hearing on the continuance motion and "admits to erring in advising the court that 13 additional days would be enough time." The trial court should not be held in error for granting Portis the continuance he asked for and agreed to. Consequently, given that Portis asked for and agreed to the continuance that was given, he obviously did not make a contemporaneous objection, and thus waived this argument.[6] ***Graves v. State***, 216 So. 3d

---

[6]Even if this argument was not waived, it would fail on the merits because Portis does not articulate any concrete facts that demonstrate prejudice. He argues that the lack of lengthier continuance deprived him of the right to present his theory of the case, without articulating what that theory was or how he was deprived of presenting it. He argues that his counsel could not secure out-of-state witnesses without identifying those witnesses or indicating what their testimony would be. He argues that counsel was unable to recognize the depth of the animosity between Portis and cocounsel, without articulating those "depths" and how the "depths" went beyond the clear problems obvious from the record. Moreover, the trial court specifically ordered Pacific, who had represented Portis for eleven months, to assist Polk-Payton, so that an attorney who intimately knew the case and was prepared for trial would be helping. Portis does not make any allegations, nor does the record contain any indications, that Pacific was incompetent in his defense. Additionally, this Court has held

15

1152, 1160 (Miss. 2016).

## 2. Witness Recall and Prior Inconsistent Statement

¶26.    This Court reviews a court's decision on whether to allow a witness to be recalled for abuse of discretion.  *Ellis v. State*, 661 So. 2d 177, 179 (Miss. 1995); Miss. R. Evid. 611(a). The Court likewise reviews decisions on the admissibility of evidence for abuse of discretion. *Carothers v. State*, 152 So. 3d 277, 281 (Miss. 2014).  This Court should reverse due to an evidentiary error only if the error affects a substantial right of a party.  *Id.* at 282.  Moreover, "[a] trial court's decision will be affirmed on appeal where the right result is reached, even though we may disagree with the reason for that result."  *Id.*

¶27.    The trial court denied Portis's request to recall Mandy in order to introduce her prior inconsistent statement into evidence for impeachment purposes.  The court relied on Rule 613 and *Moffett v. State*, 456 So. 2d 714 (Miss. 1984), to determine that the prior inconsistent statement would "violate" Rule 613(b), thus declining to allow Mandy to be recalled or the statement to be admitted into evidence.  The trial court's reliance on Rule 613 and *Moffett* was misplaced; however, the trial court did not abuse its discretion in declining to recall Mandy and admit the statement for other reasons, as explained below.  And, in any event, Portis experienced no prejudice due to the court's actions.  Thus, we affirm the trial court on this issue, but because the caselaw on this issue is conflicting and confusing, we take this opportunity to clarify the law regarding the admission of extrinsic evidence of a prior

---

that when a defendant hires new counsel at the eleventh hour, "he is not entitled to a continuance merely because new counsel was unprepared."  *Byrd v. State*, 522 So. 2d 756, 759 (Miss. 1988).

inconsistent statement when the requirements of Rule 613 are met.

¶28.    In *Moffett*, a pre-rules death penalty case (in which the benefit of any reasonable doubt must be given to the defendant), the State introduced the witness's prior inconsistent statement allegedly for impeachment purposes, but then argued "as substantive evidence the factual scenario attributed to" the contents of the prior inconsistent statement. *Moffett*, 456 So. 2d at 720.  All of this occurred on direct examination in a death penalty case. *Id.*  This Court found that, under those circumstances, "allowing the prosecuting attorney to cross-examine and impeach Johnson and allowing the prior inconsistent out-of-court statement to be received as substantive evidence against Moffett" were error. *Id.* at 720-21.  The Court also noted that if the nonparty witness admits to making the prior inconsistent statements, the written statement should not be introduced into evidence. *Id.* at 719.  In *Moffett*, the Court ruled that the reason for this rule "is that no evidence may be credited which is not purified via the witnesses' oaths that the evidence is true" and that the out-of-court statements were not "purified" via the authentication process. *Id.* at 720.  It further reasoned that

> [t]he average juror will have a difficult enough time without the statement sitting in his lap keeping distinct in his mind that which he has heard as evidence and what he has been told may be considered for impeachment only. Many suggest it is folly to think juries can – or will even attempt to – keep this distinction in mind.

*Id.*

¶29.    Rule 613 seems to contradict the notion that prior inconsistent statements should *never* be received as evidence when admitted to some extent, some caselaw seems to soften the mandate, and other post-rules caselaw follows *Moffett* strictly.  Rule 613(b) provides that

17

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require.

Miss. R. Evid. 613(b).[7]  Rule 613(b) seems to allow that Mandy's statement may be admissible, so long as she is afforded the opportunity to explain or deny it, which is exactly what Portis was trying to accomplish by recalling her.[8]  It seems to soften the prohibition in *Moffett* that extrinsic evidence of a prior inconsistent statement by a nonparty witness is never admissible if the witness admits to making the statement.  It specifically provides that a trial court may admit extrinsic evidence of a prior inconsistent statement where the witness has the opportunity to explain the statement and the opposing party has the opportunity to question the witness about the statement, or where the court determines that the interests of justice require the admission of the statement.

¶30.    Post-rules caselaw regarding Rule 613(b) and *Moffett* is contradictory and confusing. Several cases ignore or fail to address *Moffett*, applying Rule 613(b) without reference to the ban in *Moffett*.[9]  Other cases strictly apply the ban set forth in *Moffett* despite Rule 613(b),

---

[7]We use the language of Rule 613(b) that existed at the time of the trial.  The language has changed slightly, due to the 2016 restyling of the Rules of Evidence.  The changes are stylistic only, and do not change the meaning of Rule 613; thus, our analysis is applicable to the newly-styled Rule 613, as well.  *See* Miss. R. Evid. 613 *Advisory Committee Note*.

[8]Thus, the court's ruling that the recall and introduction of the statement would "violate" Rule 613(b) is misplaced.

[9]*See, e.g., Jones v. State*, 856 So. 2d 389, 393-94 (Miss. Ct. App. 2003) (witness admitted to prior inconsistent statement, so admission thereof under Rule 613(b) would be superfluous); *Pustay v. State*, 221 So. 3d 320, 332-36 (Miss. Ct. App. 2016) (noting that an unequivocal or obliging admission of the prior statement may render the statement consistent,

18

and some appear to conflate "admitting to" a statement with "explaining" a statement.[10]

¶31. In interpreting the Mississippi Rules of Evidence, it is appropriate to look to federal law interpreting the Federal Rules of Evidence for guidance. *See* **Douglas v. State**, 525 So. 2d 1312, 1316-18 (Miss. 1988). Federal courts interpreting Federal Rule of Evidence 613(b), which is substantially similar to Mississippi Rule of Evidence 613(b), have outlined the requirements with a bit more clarity. In **United States v. Meza**, the Fifth Circuit sought to clarify the law regarding Rule 613(b) and an admitted prior inconsistent statement. **United States v. Meza**, 701 F.3d 411 (5th Cir. 2012). In **Meza**, the witness admitted to his prior inconsistent statements and attempted to explain why they were inconsistent with his trial testimony. **Id.** at 416-18. The trial court allowed a tape of the prior statements to be entered into evidence, and gave a limiting instruction. **Id.** at 418. The Fifth Circuit noted that "an

thus inadmissible under Rule 613(b), but that certain explanations regarding the prior inconsistent statement are not necessarily admissions); **Foster v. State**, 508 So. 2d 1111, 1119 (Miss. 1987), *overruled on other grounds* (citing **Moffett**, but, instead of applying an absolute ban where witness admitted to the prior statement, ruling that the trial court correctly ruled that the probative value of tape recordings of the statements was outweighed by confusion of the issues their admission would cause).

[10]*See, e.g.,* **Lomax v. State**, 192 So. 3d 975, 983 (Miss. 2016) (where a nonparty witness admits to a prior inconsistent statement, extrinsic evidence is inadmissible because it impeaches the witness) (plurality opinion); **Clark v. State**, 40 So. 3d 531, 54 (Miss. 2010) (extrinsic evidence of a prior inconsistent statement is admissible where witness denies or cannot recall having made the prior statement, or otherwise fails to acknowledge the prior statement); **Brown v. State**, 682 So. 2d 340 (Miss. 1996); **Miss. Valley Silica Co., Inc. v. Barnett**, 227 So. 3d 1102, 1125-26 (Miss. Ct. App. 2016) (a prior inconsistent statement should not be admitted into evidence for any purpose where the nonparty witness admits to making the statement); **Jones v. State**, 64 So. 3d 1033, 1035 (Miss. Ct. App. 2011) (acknowledging Rule 613(b), but applying the **Moffett** ban); **Ross v. State**, 22 So. 3d 400, 413 (Miss. Ct. App. 2009); **Davis v. State**, 970 So. 2d 164, 176 (Miss. Ct. App. 2006) ("Once a witness explains a prior inconsistent statement by admitting it, extrinsic evidence of the statement cannot be admitted into evidence.").

*unequivocal* or *obliging* admission of the prior statement may indeed render it consistent, hence inadmissible under Rule 613(b)." *Id.* at 426 (emphasis added) (footnotes omitted). It emphasized that such an unequivocal or obliging admission would make any inconsistency negligible, thus "warranting exclusion under common law . . . , under Rule 403 . . . , or under Rule 613(b)'s interests of justice catchall provision." *Id.* at 427. The court contrasted this with explanations, opining that "explanations and denials run the gamut of human ingenuity, ranging from a flat denial, to an admitted excuse, to a slant, to a disputed explanation, or to a convincing explanation. Whether flatly denied or convincingly explained, the inconsistency can stay inconsistent." *Id.* at 426. The court concluded that even if the witness's explanations were an unequivocal or obliging admission, the recording that was admitted reiterates them, and, in any event, any evidentiary error would have been harmless. *Id.* at 427.

¶32. Thus, rather than an outright ban on extrinsic evidence of an admitted prior inconsistent statement, the Fifth Circuit interprets the federal rule as giving trial courts a bit more discretion. First, the court must examine whether the statement offered is inconsistent or consistent. In doing so, an unequivocal or obliging admission of the prior statement may, if offered, render the trial testimony consistent with the prior statement, taking the prior statement out of the purview of Rule 613(b).[11] We also caution courts to avoid confusing an

---

[11]In allowing that a witness under some circumstances may explain a prior statement, we do not *require* the witness be confronted with the statement before it is admissible. *See* Rule 613, cmt. (the witness must have an opportunity to explain the statement and the opposing party to examine the statement "with no specification of any particular time or sequence"). However, given discovery rules requiring witnesses be declared and subpoenaed, Rule 611, and the requirement that a foundation must be laid for impeachment

20

explanation with an unequivocal or obliging admission. We also recognize that the witness need not necessarily be confronted with the statement before it is admissible. Second, if the statement is inconsistent, even in a negligible way, the extrinsic evidence of the statement must still pass through Rule 403, the interests of justice catchall in Rule 613(b), and the multitude of court cases providing for when and how impeachment evidence must be treated before extrinsic evidence of the statement could be admitted into evidence. *See, e.g.*, ***Flowers v. State***, 773 So. 2d 309 (Miss. 2000) (a foundation regarding the statement must be laid; counsel must have a good-faith basis for the questions asked on cross-examination and therefore "may not use prior inconsistent statements as a 'guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible.'"). This Court clarifies that no outright ban on admitting extrinsic evidence of prior inconsistent statements exists, but, rather, the admission is committed to the sound discretion of the trial court, as outlined by the Fifth Circuit's standards *supra*.[12]

¶33. In the case at hand, the prior statement was read from and acknowledged, and the trial court could have properly excluded it under Rule 403 as needlessly presenting cumulative evidence, wasting time, or causing undue delay. Therefore, the trial court did not abuse its discretion by excluding the statement.

---

evidence, as a practical matter, the witness who made the statement will often be the one laying the foundation for its admission and thus, in essence, "confronted" with it; thus, given the practicalities of trial, this remains a relevant consideration for many instances in which Rule 613(b) is relevant.

[12]We emphasize that we cannot conceive of many instances in which the written or taped version of a prior statement that is admitted to by the witness would pass muster under Rule 613(b) "interests of justice" and/or Rule 403.

¶34. Moreover, Rule 611(a) provides that the trial court

> should exercise reasonable control over the mode and order of examining
> witnesses and presenting evidence so as to:
>    (1) make those procedures effective for determining the truth;
>    (2) avoid wasting time; and
>    (3) protect witnesses from harassment or undue embarrassment.

Miss. R. Evid. 611(a). At the time Portis attempted to recall Mandy, the State had been calling its witnesses in an approximate chronological fashion. After Mandy testified, both Amy and Mary had testified, and Kahle was in the midst of her testimony when Portis requested the recall. The trial court also noted that Portis had not attempted to enter the statement into evidence during cross-examination, nor had Portis subpoenaed Mandy to testify in his case in chief. And, as mentioned, the statement had been read from during Mandy's cross-examination. It is within the trial court's discretion to decide whether to allow recall of a witness. *Ellis v. State*, 661 So. 2d 177, 179 (Miss. 1995). The trial court was within its discretion to decline to recall Mandy in order to avoid wasting time.

¶35. Last, even if the trial court did err, Portis cannot point to any prejudice he suffered due to that error. As stated, the statement was read from during cross-examination, and the relevant information from the statement was thus placed before the jury. Portis does not explain how anything about the statement itself would convey anything additional to the jury than did the cross-examination that cited to and quoted from the statement.

### 3. Insufficient Evidence

¶36. In examining whether insufficient evidence supports a conviction, this Court views the evidence in the light most favorable to the prosecution, and determines whether any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *McLendon v. State*, 945 So. 2d 372, 384 (Miss. 2006). The Court reverses and renders only when reasonable jurors could not have found beyond a reasonable doubt that the defendant was guilty. *Id.* The evidence is sufficient where reasonable and fair-minded jurors might reach differing conclusions on every element of the offense. *Id.*

¶37.    Portis relies on the inconsistencies among the varying statements of both children, as well as the inconsistencies between Mandy's prior statements and her trial testimony[13] to argue that the elements of sexual battery were not proven. A person is guilty of sexual battery if he engages in sexual penetration with "[a] child under the age of fourteen (14) years of age, if the person is twenty-four (24) or more months older than the child." Miss. Code Ann. § 97-3-95 (1)(d) (Rev. 2014). Sexual penetration "includes cunnilingus, fellatio, buggery or pederasty, any penetration of the genital or anal openings of another person's body by any part of a person's body, and insertion of any object into the genital or anal openings of another person's body." Miss. Code Ann. § 97-3-97(a) (Rev. 2014).

¶38.    The ages of the parties were clearly proven. While both girls at various points made a statement or statements that Portis did not penetrate them, they made other statements that he did penetrate them, including their sworn trial testimony. Further, experts opined as to why children may not disclose sexual assault and as to why their stories about sexual assault may change. Last, the expert medical testimony indicated that the STD that the girls and Portis were diagnosed with would likely only be spread by sexual penetration, as the primary

_____

[13]Mandy's statements were in and of themselves relaying what the girls said.

23

method by which the disease is spread is by contact with genital secretions. Where conflicting testimony exists, this Court does not pass on the credibility of the witnesses; rather, the determination of credibility and resolution of conflicting evidence rests within the province of the jury. *Brown v. State*, 995 So. 2d 698, 702 (Miss. 2008). The jury resolved the conflicting evidence, and sufficient evidence exists to support its credibility determination, as a rational juror could have found that each element of the crime was found beyond a reasonable doubt. This issue has no merit.

### 4. Overwhelming Weight of the Evidence

¶39.    This Court reviews the denial of a motion for new trial based on the weight of the evidence for abuse of discretion. *McLendon*, 945 So. 2d at 385. This Court will not order a new trial unless the verdict is so contrary to the overwhelming weight of the evidence that allowing the verdict to stand would amount to an unconscionable injustice. *Id.*

¶40.    Portis argues that the verdict was against the overwhelming weight of the evidence for several reasons: 1) that the victims' testimony was inconsistent and conflicting, 2) because the physical examinations of the victims were normal and did not in and of themselves confirm or deny sexual abuse, 3) because he claims that the State's medical expert "stated that the STD could be transferred by a toilet seat, towel, or even possibly a hot bath," and 4) because the prosecution did not show the chain of custody of Portis's urine.

¶41.    First, the jury resolved the inconsistent statements of the victims against Portis, as discussed above. Furthermore, the victims gave multiple statements consistent with sexual abuse. Second, Dr. Benton testified at great length why a normal physical exam could

24

neither confirm *nor deny* sexual abuse, and his opinion was that he would expect to see these two victims have a normal physical exam even had sexual abuse occurred. Third, Dr. Benton testified that it was a near impossibility for these girls to contract the STD in any other manner than sexual abuse. In viewing the inconsistencies in the victims' testimony and the medical evidence and testimony in the light most favorable to the verdict, the verdict does not amount to an unconscionable injustice.

¶42. Fourth, Portis argues that the chain of custody of his urine was not proven. The test regarding the chain of custody is whether an indication or reasonable inference exists "of probable tampering with the evidence or substitution of the evidence." ***Tubbs v. State***, 185 So. 3d 363, 369 (Miss. 2016) (internal quotations omitted). A presumption of regularity applies to the actions of the public officers, and the defendant bears the burden of producing evidence that the chain of custody has been broken. ***Id.*** A mere suggestion of substitution does not meet this burden. ***Id.*** Moreover, it is unnecessary that every handler of the evidence testify. ***Id.*** Tonya Madison testified that she escorted Portis to LabCorp, and a LabCorp employee testified as to the results. The State offered no evidence of what occurred in between, and it certainly could have done a more thorough job showing the chain of custody. However, Portis does not provide any evidence at all that the chain of custody was broken, and no reasonable inference is made here that the evidence was tampered with or substituted. Portis has failed to meet his burden, and makes only a mere suggestion that all we can know is that "someone's" urine was tested. Viewing the chain of custody testimony in the light most favorable to the verdict, it cannot be said that the verdict is so contrary to the

25

overwhelming weight of the evidence that it amounts to an unconscionable injustice.

### 5. Cumulative Error

¶43.    The cumulative error doctrine "holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." ***Ross v. State***, 954 So. 2d 968, 1018 (Miss. 2007).  However, "prejudicial rulings or events that do not even rise to the level of harmless error will not be aggregated to find reversible error." ***Id.***  Because the Court finds no error in this case, nothing exists to be aggregated to find reversible error.[14]  This issue is without merit.

### 6. Cruel and Unusual Punishment

¶44.    Portis maintains that the two life sentences he received are unduly harsh and constitute cruel and unusual punishment.[15]  The maximum sentence for each of Portis's convictions

---

[14]For the first time on appeal, Portis argues summarily that "[t]he court erred in allowing the children to testify in camera over the Sixth Amendment objections of the defense[]" and "[t]he court further erred in allowing the statements of Olga, [Mandy], and Madison into evidence under the Tender Years Exception to the hearsay rule."  Portis cites no authority and makes no argument regarding these issues, as is required.  Miss. R. App. P. 28(a)(6).  The quoted sentences are the entirety of his "argument" on these issues.  Thus, this Court need not consider them.  ***Patton v. State***, 109 So. 3d 66, 75 (Miss. 2012).

[15]The State argues that this issue is waived because Portis failed to present statistical information to the trial court.  *See **Edwards v. State***, 800 So. 2d 454, 468 (Miss. 2001).  Portis only briefly touched on his sentences in his post-trial motion, and did not attach any statistics, stating "the Court erred in sentencing the Defendant to two consecutive life sentences due to the fact that all sex crimes carry mandatory sentences and said sentence was unjustifiably harsh and unnecessarily punitive."  On the other hand, Portis notes that his request for a presentence investigation was denied.  He summarily cites ***Presley v. State***, ostensibly in support of this denial being in error.  ***Presley v. State***, 474 So. 2d 612, 620 (Miss. 1985) (even though a presentence investigation and hearing occurred, reversing and remanding for another sentencing hearing requiring the defendant's counsel to present any

under Mississippi Code Section 97-3-95(1)(d) is life. Miss. Code Ann. § 97-3-101(3) (Rev. 2014). A sentence within the limits prescribed by statute is not ordinarily subject to appellate review. *Tate v. State*, 912 So. 2d 919, 933 (Miss. 2005). "However, where a sentence is 'grossly disproportionate' to the crime committed, the sentence is subject to attack on the grounds that it violates the Eighth Amendment prohibition of cruel and unusual punishment." *Id.* This Court has noted that it must apply the disproportionality review outlined by the United States Supreme Court in *Solem*[16] only where the defendant has shown that "a threshold comparison of the crime committed to the sentence imposed leads to an inference of 'gross disproportionality.'" *Sumrell v. State*, 972 So. 2d 572, 576 (Miss. 2008) (internal quotations omitted). Without the initial showing, this Court need not apply the *Solem* test. *Id.* (internal quotations omitted). Portis does not appear to have made a threshold comparison, yet, the State does not argue this as a basis for dismissing his claim; the State merely argues that the sentence is within the statutory limits, and then alternatively proceeds to the *Solem* analysis. Thus, we will analyze the *Solem* factors.

¶45. When a life sentence without the possibility of parole is at issue, this Court performs

---

mitigating circumstances). After denying Portis's motion for a presentence investigation, the court moved immediately into sentencing, did not first ask for any input from anyone, and closed the proceedings immediately after sentencing. A review of the record reveals that it appears it would have been nearly impossible for Portis to enter any statistics contemporaneously. The trial court did not appear to give him that chance. Any alleged waiver of this issue appears rather hazy. And Portis is raising an important constitutional right. "This Court will indulge in every reasonable presumption against the waiver of a constitutional right." *Brooks v. State*, 903 So. 2d 691, 695 (Miss. 2005) (internal quotations omitted). Because of these factors, this Court will address the issue on the merits.

[16]*Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983).

27

the extended proportionality analysis set forth in **Solem**. In examining proportionality, reviewing courts "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." **Solem**, 463 U.S. at 290. This Court must then analyze three factors: 1) the gravity of the offense and the harshness of the penalty; 2) sentences imposed on other criminals in the same jurisdiction; and 3) sentences imposed for commission of the same crime in other jurisdictions.[17] **Id.** at 290-92.

¶46. Both parties agree that sexual battery of a minor is a grave offense and that a life sentence is a harsh penalty. Both parties cite Mississippi cases in which defendants have been sentenced for sexual battery or "similar" crimes. While the courts have seemed to examine such cases with regard to the second **Solem** factor, and it is a relevant inquiry, what the **Solem** Court itself *actually* examined was those crimes for which one could and could not receive a life sentence (which Helm had received) and whether his crimes warranted such. **Id.** at 298-99. Helm had written bad checks and was a habitual offender due to prior bad check convictions. **Id.** at 296. The Supreme Court noted that life imprisonment was available for many very serious crimes in that state, such as rape and murder, and also noted that life imprisonment was *not* available for many crimes much more serious than Helm's. **Id.** at 298-99. It concluded that "Helm has been treated in the same manner as, or more

---

[17]It also appears that under United States Supreme Court jurisprudence, the second and third prongs of the **Solem** analysis are not mandated. *See Ewing v. California*, 538 U.S. 11, 23, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003). Because the State does not make this argument, we will analyze the second and third factors.

severely than, criminals who have committed far more serious crimes." *Id.* at 299. Thus, it appears that the ***Solem*** Court looked not at whether defendants who had committed the same crime in the jurisdiction received similar sentences, but instead at what crimes carried the same sentence, and whether those crimes were more or less severe than the crime committed by Helm, as well as whether those who committed more severe crimes were not subjected to such a severe sentence. We will examine both what the ***Solem*** Court analyzed, as well as compare sentences actually given for the same crime in Mississippi.

¶47. In Mississippi, crimes that carry a mandatory life sentence include first degree murder, capital murder if death is not the sentence, and treason if death is not the sentence. Miss. Code Ann. §§ 97-3-21(1), 97-3-21(3), 97-7-67 (Rev. 2014). Crimes that carry an optional life sentence include second degree murder, kidnapping, statutory rape of a child under the age of fourteen when the perpetrator is more than two years older and aged eighteen or older, forcible rape, robbery with a deadly weapon, and felony child abuse. Miss. Code Ann. §§ 97-3-21(2) (jury may fix life), 97-3-53 (jury may fix life), 97-3-65(3)(c), 97-3-65(4)(a), 97-3-79, 97-5-39(2)(d) (Rev. 2014). While certainly crimes such as murder that carry life sentences (mandatory or optional) are arguably more serious than sexual battery, other crimes that may carry a life sentence are comparable or less serious. Certain categories of statutory rape, forcible rape of an adult, and certain categories of felony child abuse are all comparable to sexual battery of a child under the age of fourteen, and all may carry a life sentence. Moreover, kidnapping and robbery with a deadly weapon may carry life sentences and are arguably less serious than sexual battery of a child under the age of fourteen, as neither

29

requires any person be physically injured. Thus, according to **Solem**, a life sentence for

sexual battery of a child under the age of fourteen is not disproportionate when considering

other crimes that also carry a life sentence.

¶48.    In terms of sentences in this jurisdiction for sexual battery under Mississippi Code

Section 97-3-95(1)(d), they predictably vary. Several defendants have been sentenced to

life.[18] Other defendants have been sentenced to serve less than life.[19] While some defendants

---

[18] *See, e.g.* **Yates v. State**, 226 So. 3d 614 (Miss. Ct. App. 2017) (sentenced to life after a guilty plea); **Patane v. State**, 225 So. 3d 6 (Miss. Ct. App. 2017) (life sentence after a guilty plea); **Dowden v. State**, 203 So. 3d 743 (Miss. Ct. App. 2016) (found guilty of four counts of sexual battery of a child younger than fourteen, sentenced to four consecutive life sentences without the possibility of parole or early release following trial); **Graves v. State**, 216 So. 3d 1152 (Miss. 2016) (sentenced to life following trial; two instances of alleged abuse had occurred); **Hobgood v. State**, 926 So. 2d 847 (Miss. 2006) (sentenced to life following a trial; abuse allegedly occurred regularly); **Renfrow v. State**, 882 So. 2d 800 (Miss. Ct. App. 2004) (life sentence following trial for one alleged instance of battery); **Sanderson v. State**, 872 So. 2d 735 (Miss. Ct. App. 2004) (life sentence following trial for one alleged instance of battery); **Carter v. State**, 996 So. 2d 112 (Miss. Ct. App. 2008) (life sentence following a trial for one count of sexual battery, where ongoing abuse was alleged).

[19] *See, e.g.*, **Powell v. State**, __ So. 3d __, 2017 WL 3712862 (Miss. Ct. App. Aug. 29, 2017) (twenty year sentence with twelve years to serve after jury trial; only one instance of battery was alleged); **Ashford v. State**, 233 So. 3d 765 (Miss. 2017) (twenty years each on four counts of sexual battery of a child under fourteen, to run concurrently for abuse that occurred over several years); **Mouton v. State**, 227 So. 3d 1079 (Miss. 2017) (twenty year sentence after a trial); **Hales v. State**, 213 So. 3d 511 (Miss. 2017) (twenty-five year sentence after a trial); **Stewart v. State**, 228 So. 3d 872 (Miss. Ct. App. 2017) (twenty-five year sentence after trial for one instance of battery); **Lindsey v. State**, 212 So. 3d 44 (Miss. 2017) (twenty-five year sentence after trial); **Carter v. State**, 204 So. 3d 791 (Miss. Ct. App. 2016) (thirty year sentence with twenty years to serve following a guilty plea); **Young v. State**, 194 So. 3d 904 (Miss. Ct. App. 2016) (twenty year sentence following a trial for one instance of battery); **Giles v. State**, 187 So. 3d 116 (Miss. 2016) (twenty-five year sentence following trial for one instance of battery); **Caldwell v. State**, 953 So. 2d 266 (Miss. Ct. App. 2007) (sentenced to thirty-five years with eighteen years suspended following a guilty plea); **Hodgin v. State**, 964 So. 2d 492 (Miss. 2007) (twenty year sentence following trial); **Mason v. State**, 971 So. 2d 618 (Miss. Ct. App. 2007) (thirty year sentence following trial for one

have received lesser sentences than Portis, others have received life sentences, some for only one described instance of battery. In Portis's case, the abuse is alleged to have been ongoing. His two life sentences do not appear disproportionate to other sentences in Mississippi.

¶49.    Regarding sentences in other jurisdictions for the *same crime*, as ***Solem*** requires,[20] Portis points to a 2001[21] report analyzing 1997 data, finding, according to him, that "the median sentence for sexual offenses against victims less than twelve (12) years of age is months and in only ten percent (10%) of all sexual assault against children results in a life sentence." What the report states is that the median sentence for "sex offenses" against children twelve and under is 180 months (which amounts to fifteen years). This may take into account a wide variety of sex offenses, guilty pleas, and any number of other factors. The bulletin is inapposite, as it does not address the "same crime" as is required in the ***Solem*** factors. The State does not bother to cite any sentences from other jurisdictions. A quick review of other states' laws reveals that most states punish child sexual abuse involving penetration of a young child harshly.[22] *See, e.g.*, Fla. Stat. Ann. §§ 794.011, 775.082 (sexual battery on a victim less than twelve years old punishable by life imprisonment); La. Stat.

---

alleged incident).

[20]The ***Solem*** Court noted that Helm could *not* have been given a life sentence without possibility of parole for his crimes in forty-eight out of the fifty states.

[21]He incorrectly cites the study as being from 2011.

[22]The Supreme Court has ruled that the death penalty for rape of a child is unconstitutional. ***Kennedy v. Louisiana***, 554 U.S. 407, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008). Prior to that ruling, five or six states provided that child rape was punishable by death.

Ann. § 43.1(C)(2) (sexual battery of a victim under the age of thirteen punishable by twenty-five to ninety-nine years hard labor); Va. Code Ann. § 18.2-67.3(B) (aggravated sexual battery punishable by one to twenty years imprisonment). Life does not appear to be an unduly or unusually harsh available sentence for the sexual penetration of a young child when compared to other jurisdictions.

¶50. While Portis was charged with one count of sexual battery for each victim, the evidence strongly implied that the abuse had been ongoing for years. The trial court noted that Portis's actions were "unspeakable and appalling" and that he had robbed the victims of their childhood innocence. He referenced the scars of the victims that they would carry into adulthood. Applying the three *Solem* factors to analyze Portis's sentences, his life sentences for sexual battery of a child under the age of fourteen do not violate the Eighth Amendment prohibition against cruel and unusual punishment.

## CONCLUSION

¶51. The trial court did not commit reversible error in this case, and Portis's convictions and sentences are affirmed.

¶52. **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**

32