# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-KA-00764-SCT

*ALBERT D. STEWART a/k/a ALBERT DEDRANNO STEWART a/k/a ALBERT STEWART*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/23/2018 |
| TRIAL JUDGE: | HON. STANLEY ALEX SOREY |
| TRIAL COURT ATTORNEYS: | MATTHEW GORDON SULLIVAN |
| | JONAS WESLEY BOWEN |
| | HEIDLE CARTER SMITH |
| | CATOUCHE JUDGE BODY |
| COURT FROM WHICH APPEALED: | COVINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CATOUCHE JUDGE BODY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | MATTHEW GORDON SULLIVAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/05/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., CHAMBERLIN AND ISHEE, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Albert Stewart was convicted of felony fleeing and of possession of a controlled substance. The trial court sentenced Stewart to serve five years for the felony-fleeing count and a consecutive three-year term for the possession count. Because we find no merit in the issues Stewart raised on appeal, we affirm his convictions and sentences.

## FACTS

¶2.    On April 26, 2016, Stewart was traveling to Moss Point. Officer Eric Banks, Officer Bruce McDonald, and Officer Joseph Barnes, each employed with the Collins Police Department, were conducting a safety checkpoint in Collins, Covington County. Officer Banks testified that the officers were checking licenses and tags. Officer McDonald testified that the officers were stopping every vehicle that came through the checkpoint. That night, Stewart pulled up to the safety checkpoint in a gray Dodge pickup. Officer McDonald walked to the driver's side of Stewart's truck. Stewart's driver's side window did not work at that time, so Stewart cracked open his driver's side door and informed Officer McDonald that he was "trying to get his driver's license." Stewart opened the door again a short time later and handed Officer McDonald his driver's license with his left hand. Officer McDonald had a flashlight on, and the inside lights in Stewart's truck also were on. Stewart's right hand was resting on his middle console. Officer McDonald testified that Stewart was acting very nervous, and when he opened the truck door, money fell on the running board.

¶3.    Officer Banks walked to the passenger's side of Stewart's truck and shined his flashlight through Stewart's window. Officer Banks testified that he could see Stewart holding something in his right hand that looked like a bag of "dope." Officer Banks called out to Officer McDonald, and Officer McDonald walked to the rear of Stewart's truck after informing Stewart that he was checking Stewart's tag. Officer Banks then informed Officer McDonald that Stewart had something in his right hand but did not specify what he suspected. Officer McDonald walked back to Stewart and twice asked Stewart what he had in his hand. Stewart responded "nothing" twice. Officer McDonald then reached for his gun.

2

Officer McDonald testified that he had started reaching for his gun because he thought Stewart might have had a weapon in his right hand. At that point, Stewart peeled away quickly in his truck. Officer McDonald fired one shot, hitting Stewart's left rear tire.

¶4.     Officer Banks testified that when Stewart drove away, he almost hit both Officer Banks and Officer Barnes. A high-speed pursuit ensued reaching speeds of approximately one hundred miles per hour. Stewart also ran through a red light and swerved through vehicles. Officer Barnes testified that his was the first car in pursuit of Stewart and that he noticed small stuff that seemed like bugs hitting his windshield. Stewart stopped approximately two and a half miles away after the left rear tire of his truck fell off, exposing his wheel. Officer Barnes stated that Stewart's front passenger's side window and the back glass were open on his truck.

¶5.     Officers Banks and Barnes testified that after Stewart stopped, they saw evidence of what looked like powder and rock cocaine loose on the floorboard of Stewart's truck. Officer McDonald testified that what appeared to be cocaine was "basically all over the inside of the truck. Mostly, you know, in the seat, floorboard." Officer McDonald stated that Stewart's window was down and that it appeared that Stewart had been trying to throw the substance out of the truck but that the wind had blown it back in. He testified that Stewart's floorboard did not contain any of the white substances at the checkpoint but that when Stewart stopped after the pursuit was over, the substance was all over the truck.

¶6.     Officer McDonald collected the white substances from the inside of Stewart's truck and put the pieces into a white Styrofoam cup. Jamie Johnson testified that she was a forensic

3

scientist specializing in the field of drug analysis and that she was employed with the Mississippi Forensics Laboratory. She stated that, based on her analyses, she was able to determine that the substance collected was cocaine.

¶7. Stewart testified in his own defense. Stewart stated that the only thing he had in his hand at the checkpoint was his flip phone. He stated that he ran from the checkpoint because he was scared when Officer McDonald reached for his gun and because he did not want Officer McDonald to shoot him. Stewart denied throwing anything out of his vehicle. Stewart also testified that when he got to the police station, a white Styrofoam cup was sitting on a desk in the interrogation room. However, he testified that he never saw what was inside the cup.

**PROCEDURAL HISTORY**

¶8. The State produced Officer Barnes's dash-camera video in April 2017 and Officer Banks's body camera video and the first of Officer McDonald's body-camera video in June 2017.[1]

¶9. On July 6, 2017, a Covington County grand jury indicted Stewart with felony-fleeing charges in violation of Mississippi Code Section 97-9-72(2) and with possession of cocaine in violation of Mississippi Code Section 41-29-139.

¶10. On February 23, 2018, Stewart filed a motion for discovery. As a result of supplemental discovery, on March 13, 2018, eight days before trial, the State produced two additional videos of Officer McDonald's body camera, a fifty-nine second video and a fifty-

---

[1]In all, the State produced three videos of Officer McDonald's body camera.

two second video.

¶11. On March 19, 2018, Stewart filed a Motion to Compel Production of All Originals and Copies of Videos in Native Form and Motion to Continue. Stewart argued that the State initially had provided three body-camera and dash-camera videos. However, the State produced the two additional videos of Officer McDonald's body camera on March 13, 2018, as a result of supplemental discovery. Stewart contended that the videos were edited and were not continuous. He requested an order requiring the State to produce for inspection the originals and copies of the body-camera and dash-camera videos. Stewart also requested a continuance of his March 21, 2018 trial in order to hire appropriate experts to examine the videos and metadata provided by the State. The trial court denied Stewart's motions.

¶12. On March 21, 2018, the day of Stewart's trial, he filed a Motion in Limine to Exclude Hearsay and/or Speculative Statements, in which he moved the trial court to exclude all hearsay statements and speculative statements of police officers referring to defendant as a drug dealer or to the defendant's alleged criminal activities. Stewart additionally filed a motion to suppress physical evidence seized on the night of his arrest. Stewart argued that he could establish a break in the chain of custody, because the officer abandoned standard procedure by placing physical evidence in a white Styrofoam cup instead of an evidence bag or container. Stewart then filed a motion to compel additional discovery, again requesting that the State provide the missing portions of the video footage. The trial court denied those motions.

¶13. On March 21, 2018, a Covington County jury found Stewart guilty of felony fleeing

and of possession of cocaine. The trial court sentenced Stewart to serve five years for the

felony-fleeing conviction and three years for the possession conviction to run consecutively.

¶14.    Stewart raises the following issues on appeal:

> I.      Whether the trial court erred by denying Stewart's peremptory strike of Juror 15.
>
> II.     Whether the trial court erred by not allowing examination of the videos.
>
> III.    Whether the trial court erred by allowing the State to read from an internet document not entered into evidence.
>
> IV.     Whether the trial court erred by admitting drug evidence.
>
> V.      Whether the trial court erred by denying Stewart's motion for continuance.
>
> VI.     Whether the trial court erred by admitting the videos into evidence.
>
> VII.    Whether the trial court erred by finding the roadblock constitutional.

**ANALYSIS**

**I.      Whether the trial court erred by denying Stewart's peremptory strike of Juror 15.**

¶15.    Stewart first argued that he should be granted a new trial because the trial court erred

by denying his peremptory strike of Juror 15. The United States Supreme Court, in **Batson**

**v. Kentucky**, held that peremptory strikes may not be used in a discriminatory manner.

**Batson v. Kentucky**, 476 U.S. 79, 86, 106 S. Ct. 1712, 1717, 90 L. Ed. 2d 69 (1986). The

trial court's findings under **Batson** are "afforded great deference because they are largely

based on credibility." **Puckett v. State**, 788 So. 2d 752, 756 (Miss. 2001) (citing **McGilberry**

**v. State**, 741 So. 2d 894, 923 (Miss. 1999), *overruled on other grounds by **Franklin v. State***,

6

170 So. 3d 481 (Miss. 2015)). Factual findings are reversed only when they are clearly

erroneous. *Id.*

¶16.    This Court has outlined the three-part test to be used when a ***Batson*** challenge is

raised:

> First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the State to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered by the prosecution, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.

***Hardison v. State***, 94 So. 3d 1092, 1098 (Miss. 2012) (quoting ***Pitchford v. State***, 45 So. 3d

216, 224 (Miss. 2010)).

¶17.    Counsel for Stewart used his first three peremptory strikes to exclude from the venire

Jurors 4, 7, and 8, all of whom were Caucasian females. The State raised a ***Batson*** challenge

and argued discrimination. Defense counsel explained that he excluded Juror 4 because she

was a retired teacher and because teaching was a more conservative occupation. The trial

court allowed the strike. The trial court also allowed defense counsel to strike Juror 7 because

of the way she "looked" and "peered" at defense counsel. Juror 8 was struck because she was

the vice-president of a loan company and that also was a more conservative occupation.[2]

¶18.    Defense counsel then accepted Juror 14, an African-American male teacher.

However, the defense struck Juror 15, a Caucasian male teacher. The State again raised a

***Batson*** challenge. The trial court stated that a pattern of racial discrimination was evolving.

---

[2]Defense counsel also struck Juror 10, a male, but no ***Batson*** challenge was raised.

Defense counsel responded that his strike of Juror 15 was race neutral because Juror 15 was a teacher and was also married to someone that was employed by Seminary Baptist Church. He explained that he was not excluding all teachers but was trying to limit the number of teachers on the jury. The trial court stated that defense counsel was not striking all teachers but was instead striking only white teachers. The trial court found a pattern of discrimination and did not allow defense counsel to strike Juror 15.

¶19. On appeal, Stewart's counsel contended that each side was given six peremptory strikes. He argued that he was nearing the end of his strikes and was faced with the dilemma of two potential jurors, Jurors 14 and 15, who were both teachers. Defense counsel stated that he also wanted to strike "a juror further down the jury venire whom the defendant wanted to avoid" but did not specify the juror. He contended that he looked at the spousal information for the jurors and noticed that Juror 15's spouse had what he believed to be a conservative occupation. Therefore, he argued that he chose to strike Juror 15 for a valid, race-neutral reason.

¶20. This Court previously has stated that employment history is a sufficient race-neutral reason for striking a venire member. *Davis v. State*, 660 So. 2d 1228, 1242 (Miss. 1995) (citing *Lockett v. State*, 517 So. 2d 1346 (Miss. 1987)). However, disparate treatment of similarly situated jurors "is strong evidence of discriminatory intent." *Manning v. State*, 765 So. 2d 516, 520 (Miss. 2000) (citing *Freeman v. State*, 651 So. 2d 576, 587 (Ala. Crim. App. 1994)). Here, Stewart used peremptory strikes against two Caucasian teachers, Jurors 4 and 15, reasoning that teaching is a more conservative occupation. Yet Stewart accepted Juror

14, an African-American teacher. Although Stewart argued that Juror 15's spouse also had a conservative occupation, the trial court found that argument unpersuasive. We cannot find that the trial court manifestly erred in its holding that Stewart had failed to present a valid, race-neutral reason for striking Juror 15. Accordingly, because the trial court's decision to deny Stewart's peremptory strike of Juror 15 was not clearly erroneous, this issue is without merit.

## II.      Whether the trial court erred by not allowing examination of the videos.

¶21.    Stewart next argues that the trial court erred by denying his motion to compel the State to produce for inspection the original dash-camera and body-camera videos in their native forms and all copies and edits of the videos.

¶22.    As previously stated, the State submitted three separate videos of Officer McDonald's body camera. The first video was submitted more than a year before trial. However, the second two videos were not submitted by the State until March 13, 2018, eight days before trial began.

¶23.    The first of Officer McDonald's body camera videos that was submitted more than a year before trial initially showed Officer McDonald at Stewart's driver's side window. The video captured the point when Stewart drove away from the roadblock, and it continued through the pursuit of Stewart. The video showed Officer McDonald arrest Stewart and place him in the back of Officer McDonald's police vehicle. The video ended when Officer McDonald and Officer Banks pulled Stewart out of the back of the police vehicle to search him again. The video was six minutes and thirty-seven seconds long. Officer McDonald

testified that he turned his body camera off at that point because Officer Banks had his body camera on.

¶24. The second video, submitted eight days before trial, starts with Officer McDonald and another officer standing on each side of Stewart's truck with the back doors open. Officer McDonald was collecting white, rock-like substances from Stewart's back seat and putting the substances into a white Styrofoam cup. He shut the door and showed another officer the contents of the Styrofoam cup. The video then abruptly stops. The video is only fifty-nine seconds long.

¶25. The third video was submitted at the same time as the second video. When the third video begins, Officer McDonald is collecting evidence from the floorboard of the front driver's side of Stewart's truck. He again puts the white, rock-like substances into a white Styrofoam cup. The video is only fifty-two seconds long and ends when Officer McDonald shut the door to Stewart's truck and walked back to his police vehicle.

¶26. On March 19, 2018, Stewart filed a Motion to Compel Production of all Originals and Copies of Videos in Native Form and Motion to Continue. Stewart argued that Officer McDonald's body camera videos seemed to have been cut and/or edited and were not continuous. Therefore, he contended that the cut-out portions of Officer McDonald's body camera videos contained exculpatory evidence and may have shown police misconduct. The State argued in response that it had discovered the two additional videos on March 12, 2018, and had turned over copies to the defense the following day. Stewart contended that the prosecutor had allowed him to come to the prosecutor's office to look at the videos but had

10

denied Stewart's request to bring his expert to examine the videos.

¶27. The State also submitted Officer Banks's body camera. Stewart argued that Officer Banks's body camera ended during a pivotal moment. The video began when Stewart pulled up to the road block. It shows Officer Banks walking to the passenger side of Stewart's truck, shining his flashlight into Stewart's passenger side front window, calling to Officer McDonald, and telling Officer McDonald to check Stewart's hands. Officer Banks then walked back to the passenger's side of Stewart's truck and attempted to open the front passenger's side door. The door appeared to be locked. He knocked on the passenger's side window twice, and Stewart drove away. Officer Banks began to pursue Stewart. While in pursuit, Officer Banks stated over the radio that he had seen "dope" in Stewart's hand. Officer Stewart pulled over and picked up a box from the side of the road that he believed Stewart had thrown out of his vehicle.

¶28. Stewart had already been arrested when Officer Banks arrived. The video shows Officer Banks pull beside Stewart's truck and walk to the open driver's side door. Another officer is seen going through Stewart's truck. Officer Banks then walked to Officer McDonald's car, where Stewart was sitting in the back seat. Officers McDonald and Banks pulled Stewart out of the car to search him again. At this point, the first video of Officer McDonald's body camera had ended. The officers began to search Stewart. But Officer Banks's body camera falls off while he is searching Stewart. The rest of the search can be partially seen from the camera lying on the ground. One of the officers asked Stewart why he ran from the road block, and Stewart replied, "because I had liquor in the truck and I got

11

scared." The camera remained on the ground from approximately minute eight to minute twenty-three. Officer Banks then picked up the body camera and chatted with several other officers while Stewart's truck was being towed. The video ended when Officer Banks got into his car. The video is twenty-seven minutes and twenty-seven seconds long. We find no merit in Stewart's contention that Officer Banks's body camera video ended at a pivotal moment.

¶29. The State lastly submitted Officer Joseph Barnes's dash-camera video that showed Officer Barnes in pursuit of Stewart. It showed Stewart pull over on the side of the road after his rear left tire fell off. Stewart got out of his truck and immediately laid on the ground. The video showed Officers McDonald and Barnes searching Stewart's person. It then showed several officers searching Stewart's truck.

¶30. Stewart cited *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and merely argued that "there may have been exculpatory evidence. Denial of the evidence violated the principles outlined in *Brady* and *Giglio*." Stewart does not expound on his argument. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In *Giglio*, the government "failed to disclose an alleged promise made to its key witness that he would not be prosecuted if he testified for the Government." *Giglio*, 405 U.S. at 151. Because the key witness was integral to the case

12

against Giglio and because his credibility as a witness was an important part of the case, the Supreme Court held that due process required a new trial. *Id.* at 154-55. The Supreme Court stated that a new trial is not automatically required when evidence is discovered after trial that could possibly have been useful but was not likely to change the verdict. *Id.* at 154. Therefore, a finding of materiality of the evidence is required. *Id.* (citing *Brady*, 373 U.S. at 87).

¶31.   Here, Stewart argued that Officer McDonald's body camera videos seemed to have been cut and/or edited. He contended that the cut-out portions of the videos contained exculpatory evidence. However, Stewart did not specify what exculpatory evidence the videos might contain. More than a year before trial, the State submitted Officer McDonald's first body-camera video, Officer Banks's body-camera video, and Officer Barnes's dash-camera video. Each of those videos portrayed Stewart driving away from the safety checkpoint. The videos also show the pursuit of Stewart and show Stewart running a red light and swerving through vehicles. Thus the missing portions of Officer McDonald's body camera would not affect Stewart's felony-fleeing conviction.

¶32.   In addition, Officer McDonald testified at trial that he manually turned his body camera off and on. Yet Stewart did not argue that Officer McDonald's turning off his body camera amounted to destroying evidence. Stewart also does not articulate how the missing portions of the video would have affected his cocaine-possession conviction. Therefore, Stewart failed to show the materiality of the missing portions of Officer McDonald's body camera. A blanket statement that the missing portions of Officer McDonald's body-camera

13

videos might have contained exculpatory evidence is insufficient to satisfy ***Brady*** and ***Giglio***.

¶33. Accordingly, because the trial court's denial of Stewart's motion to compel was not in error, this issue has no merit.

**III.** **Whether the trial court erred by allowing the State to read from an internet document not entered into evidence.**

¶34. Stewart argued that the prosecution's use of an internet document during cross-examination denied him his right to a fair trial. Although the prosecutor's use of his phone during trial to recite information from a Wikipedia document is concerning, this issue ultimately has no merit.

¶35. At trial, Stewart testified that he did not get out of the truck with his hands up at the safety checkpoint because Officer McDonald had pulled a gun on him and he was scared. Stewart testified, "I'd been watching for two or three days a dude in Baton Rouge getting killed and the dude in Minnesota get killed. I didn't want to get killed. I wanted to see my momma again." On cross-examination, the following dialogue occurred:

> PROSECUTOR: Let me get this. You said you were scared that Bruce McDonald was going to hurt you?
>
> STEWART: Yes.
>
> PROSECUTOR: Why was that? Because of something you had been watching on T.V.?
>
> STEWART: Yes sir.
>
> PROSECUTOR: What had you been watching on T.V.? You said something about Baton Rouge –
>
> STEWART: The news where when I was sitting in the hospital with my mom.

14

PROSECUTOR: Yeah. About the guy in Baton Rouge?

STEWART: Yes, sir.

PROSECUTOR: Okay. What was his name?

STEWART: I forgot his name.

PROSECUTOR: Are you talking about the guy that they showed the video of that got beat up and killed, I believe?

STEWART: Yes, sir.

PROSECUTOR: Okay. Well, would it surprise you that that happened on July 5, 2016? This incident happened on April 26th of 2016. That's funny you were watching that on T.V. right before this, isn't it?

STEWART: No, sir.

PROSECUTOR: Okay. Well, I'm sitting here looking at a printout from Wikipedia –

STEWART: Yes, sir.

PROSECUTOR: – about the shooting of Alton Britt on July the 5th, 2016 –

Stewart's counsel objected at this point and argued that the prosecutor was testifying about a document that was on his phone and not in evidence. The trial court directed the prosecutor to rephrase his question. The prosecutor continued to question Stewart about the date of the safety checkpoint versus the date of the Baton Rouge shooting. Stewart did not renew his objection, request a curative instruction, or move for a mistrial.

¶36. In closing arguments, the prosecutor again mentioned the date of the Baton Rouge shooting. He stated,

He lied to y'all too. He told y'all he had been sitting there watching the stuff in Baton Rouge about this previous beating and shooting of that young man,

15

which was horrific. That did not happen at that time. I knew that did not happen at the point in time that this incident occurred because I was in Baton Rouge the week before it had — the week before it happened, and I remember it was not April of 2016 that I was in Baton Rouge.

Stewart did not object to the prosecutor's statements in closing argument.

¶37. "Attorneys are afforded wide latitude in arguing their cases to the jury, but they are not allowed to employ tactics which are 'inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.'" *Galloway v. State*, 122 So. 3d 614, 643 (Miss. 2013) (quoting *Sheppard v. State*, 777 So. 2d 659, 661 (Miss. 2000)). The prosecutor may not state facts that are not in evidence and that the trial court does not judicially know. *Id.* It was error for the prosecutor to refer to information obtained from a Wikipedia document on his phone during cross-examination. But the standard is "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Id.* (internal quotation marks omitted) (quoting *Sheppard*, 777 So. 2d at 661).

¶38. Stewart failed to show that the prosecutor's improper statements during cross-examination resulted in a decision influenced by prejudice. The Court issued a jury instruction stating, "[a]rguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but are not evidence. If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark." Stewart also did not request a curative instruction or move for a mistrial at the time the statements were made.[3] "[T]o preserve an objection to alleged improper remarks by

---

[3]Stewart requested a mistrial after the trial had concluded in posttrial motions.

16

counsel during closing argument, the complaining party must not only make a contemporaneous and specific objection to the remarks, but must also obtain a definitive ruling from the trial court on his objection and must request corrective action." ***Rials v. Duckworth***, 822 So. 2d 283, 287 (Miss. 2002). Because Stewart failed to object to the prosecutor's statements in closing argument, he is barred from raising it on appeal. ***Rushing v. State***, 711 So. 2d 450, 455 (Miss. 1998). Therefore, we find no merit in this issue.

¶39.    Lastly, Stewart's argument on appeal states,

> The rules of evidence are in place to prevent such misconduct. The trial court failed to protect Mr. Stewart and his right to a fair trial.
>
> The State being allowed to read from the document neither authenticated nor properly entered into evidence, deprived the Defendant's right to a fair trial and due process. The admission of the evidence violated rules 802, 803, 403, 901, and 903 of the Mississippi Rules of Evidence. Defendant's rights to due process under the Fourth[,] Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution are being violated.

"[I]n the absence of meaningful argument and citation of authority, this Court generally will not consider the assignment of error." ***Patton v. State***, 109 So. 3d 66, 75 (Miss. 2012) (internal quotation marks omitted) (quoting ***Randolph v. State***, 852 So. 2d 547, 558 (Miss. 2002)).

¶40.    Because Stewart failed to show that the prosecutor's statements resulted in a decision influenced by prejudice, failed to object to the prosecutor's statements in closing argument, failed to request a curative instructive or motion for a mistrial, and failed to provide meaningful argument and citation of authority, this issue has no merit.

**IV.    Whether the trial court erred by admitting drug evidence.**

¶41. Stewart contended that, because Officer McDonald initially collected evidence in a Styrofoam cup instead of putting the evidence in an evidence bag, there was a clear break in the chain of custody and standard evidentiary protocol utilized by law-enforcement officers. The trial court found that the defense had not met its burden of producing evidence of a break of the chain of custody and denied Stewart's motion to suppress. Stewart now contends that the trial court was in error.

¶42. This Court will not reverse the trial court on a chain-of-evidence-in-control-of-the-authorities issue unless it abused its discretion. *Nixon v. State*, 336 So. 2d 742, 744 (Miss. 1976) (quoting *Nix v. State*, 276 So. 2d 652, 653 (Miss. 1973)). "The test is whether or not there is an indication of probable tampering with the evidence." *Id.* (quoting *Nix*, 276 So. 2d at 653). "A presumption of regularity applies to the actions of the public officers, and the defendant bears the burden of producing evidence that the chain of custody has been broken." *Portis v. State*, 245 So. 3d 457, 473 (Miss. 2018) (citing *Tubbs v. State*, 185 So. 3d 363, 369 (Miss. 2016)).

¶43. Officer McDonald testified, and it is shown on the body-camera videos, that he collected evidence from Stewart's truck and put it in a white Styrofoam cup. He testified that after he finished collecting evidence, he locked the cup in his vehicle. He then put the evidence in a plastic evidence bag that he had in his patrol car and sealed the bag. Officer McDonald stated that he labeled the bag and put it in the evidence vault in the locker. He then personally delivered the evidence bag to the crime lab. Officer McDonald testified that, after the evidence was processed, he picked it up from the crime lab and that the bag had not

18

been tampered with or altered since.

¶44. Stewart had the burden to prove that the chain of custody had been broken. Stewart testified that he saw a white Styrofoam cup in the interrogation room after he was arrested. But Stewart admitted that he did not see what was inside the cup and could not confirm that it was the same white Styrofoam cup in which Officer McDonald had collected evidence. Stewart argued that Officer McDonald abandoned standard procedure for gathering evidence by first placing the evidence in a white Styrofoam cup inside of an evidence bag. Stewart does not support that argument with evidence, however. A mere suggestion that Officer McDonald did not follow correct procedure is insufficient. ***Portis***, 245 So. 3d at 473.

¶45. Because Stewart failed to meet his burden of showing a break in the chain of custody, the trial court did not err by denying Stewart's motion to suppress.

## V. Whether the trial court erred by denying Stewart's motion for continuance.

¶46. Stewart's fifth contention is that he was not able to defend himself properly after the State submitted the two videos of Officer McDonald's body camera eight days before trial. He argued that he should have been given more time to hire necessary experts to examine the police procedures and protocols depicted in the videos.

¶47. Although Stewart raises this issue, his argument consists of the following:

> The Defendant was unable to hire the appropriate law enforcement expert(s) to examine the police procedures and protocols depicted in the new videos.

> The Defendant was not able to properly defend himself. He was not given more time to hire the necessary experts. Indeed, the Defendant's rights to due process pursuant to the Fourth, Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution will be violated.

19

Further, the defendant was denied possible exculpatory evidence.

As previously stated, "in the absence of meaningful argument and citation of authority, this Court generally will not consider the assignment of error." ***Patton***, 109 So. 3d at 75 (quoting ***Randolph***, 852 So. 2d at 558). Because Stewart failed to support his contention with meaningful argument and citation of authority, this issue has no merit.

¶48.    Additionally, this issue has no merit because a trial court's decision to grant or deny a motion for continuance is reviewed for abuse of discretion. ***Arrington v. State***, 267 So. 3d 753, 758 (Miss. 2019). The denial of a continuance will not be reversed "unless manifest injustice appears to have resulted from the denial." ***Id.*** (internal quotation mark omitted) (quoting ***Miles v. State***, 249 So. 3d 362, 368 (Miss. 2018)). Stewart requested a continuance to hire appropriate computer/video experts to examine the videos and metadata provided by the State. Stewart stated he also "may need to hire experts related to police procedures and protocols depending upon the information provided."

¶49.    Although the State did not produce two videos of Officer McDonald's body camera until eight days before trial, Stewart did not file a motion for continuance until two days before trial. It was argued the day of trial. The trial court found that Stewart had more than a year to seek out experts regarding police procedures, regardless of the late submission of the two videos. It failed to see how the two snippets of video produced by the State changed the nature of Stewart's defense. Stewart failed to prove that the trial court's denial of his motion for continuance resulted in manifest injustice. Therefore, the trial court did not abuse its discretion by denying Stewart's motion for continuance.

**VI.    Whether the trial court erred by admitting the videos into evidence.**

¶50.    Throughout the body-camera videos, law-enforcement officers referred to Stewart as a drug dealer and speculated that Stewart was selling "dope." Stewart filed a Motion in Limine to Exclude Hearsay and/or Speculative Statements and requested that all such statements be redacted. He argued that the statements were prejudicial to the defendant. The admission or exclusion of evidence is within the sound discretion of the trial court. *Miss. Transp. Comm'n v. Fires*, 693 So. 2d 917, 920 (Miss. 1997).

¶51.    Stewart argued that the statements should have been excluded under Mississippi Rule of Evidence 602 and that the statements were admitted in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article 3, sections 14, 23, and 26 of the Mississippi Constitution. And he argued, the trial court erred under Rules 403 and 404 of the Mississippi Rules of Evidence. The State argues that Stewart did not expound on this claim and did not cite sufficient authority to support his argument. We agree.

¶52.    In addition, Stewart had the videos containing the officers' statements for more than a year before trial. Yet Stewart did not file his motion to exclude the statements until March 21, 2018, the day of trial. The State argued that it did not know how to edit out the statements at that late date. Counsel for Stewart responded that, if the information did get in, he requested an instruction advising the jury that the officers' statements were speculation and carried no weight. Because of the lateness of the motion and because the videos reflected the officers' impressions at the scene, the trial court denied Stewart's motion to exclude the statements.

¶53.    Before showing the video to the jury, Stewart objected to the statements' being admitted. The trial court responded that the issue would be addressed with a limiting instruction. It asked Stewart if he would like the limiting instruction to be issued at that time or with the jury instructions. Stewart answered that he would prefer the instruction to be issued during jury instructions. During the jury-instruction discussion, however, Stewart failed to request a limiting instruction. Also, at the end of the jury-instruction conference, the trial court asked defense counsel if he had any other requests for instructions. Defense counsel stated that he did not. "[D]ecisions of trial strategy are presumed to be reasonable." *Burns v. State*, 813 So. 2d 668, 677 (Miss. 2001). Due to the combination of the lack of timeliness of Stewart's motion in limine, Stewart's failure to request a limiting instruction, and the failure to make a reasonable argument, we find that the trial court did not abuse its discretion by denying Stewart's motion to exclude hearsay filed the day of trial.

**VII.    Whether the trial court erred by finding the roadblock constitutional.**

¶54.    Stewart lastly argued that the April 26, 2016 roadblock was illegal. He stated that the State failed to provide any discovery as to the nature and purpose of the roadblock. The trial court found that the Collins Police Department had conducted a valid safety checkpoint and denied Stewart's motion to suppress the drug evidence.

¶55.    Stewart argued that the State must show that the roadblock was not set up just to harass citizens. This Court previously has held that a roadblock with the primary purpose of checking drivers' licenses and insurance cards is constitutional. *McLendon v. State*, 945 So. 2d 372, 380 (Miss. 2006). At trial, Officer Banks testified that he and two other officers had

been conducting a safety checkpoint and were checking licenses and tags. Officer McDonald testified that when Stewart pulled up to the checkpoint, Officer McDonald asked for his driver's license. Officer McDonald's body-camera video shows that Stewart opened the door to his truck and told the officer that he was looking for his license. Officer McDonald additionally testified that the officers were stopping every vehicle that came through the checkpoint that night. This Court also has found roadblocks constitutional when law-enforcement officers routinely stop every vehicle. *McLendon*, 945 So. 2d at 382.

¶56. Further, the State produced Officer McDonald's first body-camera video that depicted the roadblock on June 29, 2017. Stewart did not file a motion to suppress the evidence obtained as a result of the illegal roadblock until March 16, 2018, five days before trial. In Stewart's motion to suppress, he merely argued that roadblocks are a violation of the Fourth Amendment under certain circumstances. Stewart did not depose any of the officers regarding the nature and purpose of the roadblock or produce any evidence supporting his claim that this roadblock was illegal. Accordingly, this issue is without merit.

## CONCLUSION

¶57. Because the issues raised on appeal are without merit or meaningful argument and citation of law, we affirm Stewart's convictions and sentences.

¶58. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**