# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-KA-01432-SCT

*PHILLIP SHANE HOUSE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/20/2024 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | BENJAMIN DAVID LANG |
| | JOSHUA EDWARD CLEMONS |
| | PAYTREEN KEYUM DAVIDSON |
| | SCOTT WINSTON COLOM |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ASHLEY LAUREN SULSER |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/26/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. On November 20, 2024, a Lowndes County jury convicted Phillip Shane House of first degree murder. House appeals his conviction and life sentence. He argues that the State presented insufficient evidence of deliberate design and that the verdict was against the overwhelming weight of the evidence. The Court affirms House's conviction and sentence.

# FACTS AND PROCEDURAL HISTORY

¶2. On June 19, 2023, House went to the YMCA in Caledonia with his ex-girlfriend Summer Danielle Tennyson, the two sons that they shared, Gabe and Grayson, and Tennyson's two daughters, Kayla and Kelly.[1] Tennyson and House took the children to the YMCA to play in the pool. While in the pool, Kayla and Kelly got into an argument, and House went over to stop the disagreement. The events caused some tension between House and Tennyson, and they began to argue. Following the dustup with House, Tennyson and the children left the YMCA and went to a friend's home to eat. Tennyson left her daughters there to spend the night and took her two younger sons home.

¶3. Kayla and Kelly returned home the following morning on June 20, 2023, at around 9:00 a.m. Kayla noticed that the door leading from the carport into the kitchen was cracked open. Kelly went to check on her mother and tried to wake her up. Tennyson would not wake up, but Kelly believed her to be asleep. Gabe was also in the bed with Tennyson, sleeping. Around 11:30 a.m., Anita Shaffer, Tennyson's mom, called Kayla and asked her to check on Tennyson. It was Shaffer's habit to text Tennyson every morning, and although Tennyson would not normally reply immediately, Shaffer noted that Tennyson would always reply by about 10 or 11 a.m. Shaffer also had received several texts from House early that morning that gave her reason to be concerned about Tennyson. Between 5:01 a.m. and 5:52 a.m., Shaffer and House exchanged the following text messages:

House: You need to go get the boys now!!!

---

[1]Fictitious names are used to protect the identities of the minor children.

| | |
|---|---|
| Shaffer: | What is going on? |
| House: | Just go |
| Shaffer: | I am trying to get ready to go to work and I want to know what is going on?  Do I need to call Danielle? |
| House: | You need to go get the boys |
| Shaffer: | I don't know what is going on but I do know that you and Danielle need to get it together.  The back and forth arguing and carrying on needs to stop.  Are you working? |
| House: | You need to go get them before they wake up. . . .  Now |
| Shaffer: | Can you not go get them?  Shane, you need to tell me what's going on. |
| Shaffer: | Where is [Kayla and Kelly]? |

¶4.    When Kayla went to check on her mom around 11:30 a.m., she noticed blood.  Kayla attempted to shake Tennyson awake, "but her back was rock solid."  Kayla then turned on the overhead light, and both Kayla and Kelly noticed "a big pile of blood behind [Tennyson] and on the bed behind her."  The girls called 911.  Sergeant Thomas Honnoll with the Lowndes County Sheriff's Department was the first officer to arrive.  Footage from Honnoll's body camera was played for the jury.  The footage depicted Honnoll's initial entry into the home and the position of Tennyson in her bed.  Dr. Paul Uribe performed Tennyson's autopsy.  He concluded that Tennyson died from a gunshot wound that entered at her right eye and exited the back of her scalp.  Dr. Uribe also concluded that the manner of Tennyson's death was homicide.  Greg Merchant, the county coroner, determined Tennyson's time of death to be between approximately midnight and 3:00 a.m. to 4:00 a.m.

¶5.     Captain Drew McCain was the lead investigator for the case. He photographed the scene and located an empty gun box for a .9 mm gun on top of the dresser as well as a projectile inside the pillow underneath Tennyson's head. Detective Rachel Richardson also located a spent .9 mm shell casing on the bed while processing the scene. Kayla and Kelly told investigators that Tennyson had purchased a .9 mm gun for House. McCain recovered Tennyson's cell phone from underneath her body. McCain collected dirt that he found between the comforter and the bed itself. McCain also noted that the door frame leading from the carport into the kitchen had scratch marks on it, which he suggested might have been from someone trying to use a tool to gain entry without a key to the lock. The police were not able to locate the weapon used to kill Tennyson, nor were they able to collect any fingerprints from the scene.

¶6.     Shaffer arrived at Tennyson's home while the crime scene was being processed and showed the officers the text messages she had received from House earlier that morning. The officers went in search of House. Captain McCain testified that after seeing the messages, "[w]e greatly wanted to talk to Mr. House and figure out what that text message meant, one. And two, where he had been all day." The Lowndes County Sheriff's Department was able to obtain House's vehicle information and set up an alert so that if his vehicle was caught by a camera, an email notification would be sent to the sheriff's department.

¶7.     At around 10 p.m. on June 20, 2023, the sheriff's department was alerted to a sighting of House's vehicle on one of their cameras near his home in Columbus. A patrol deputy stopped the vehicle, driven by House, and requested that he come to the sheriff's department

4

to speak with the investigators. House agreed and when he arrived, he was read his *Miranda*[2] rights and interviewed. When police booked House, they took his wallet and photographed several cards in the wallet. Captain McCain testified that he "noticed fraying and damage to the end of the cards which is consistent with a card being used to jimmy a door." McCain noted that when he entered Tennyson's home, the door was ajar, but the lock was still engaged. Additionally, Kayla testified that she had seen House open a locked door with a credit card on another occasion at a previous residence. Pursuant to a warrant, investigators also searched House's vehicle. From inside the vehicle, they collected a cell phone and a pair of boots. Captain McCain noted that the boots had dirt on them, which reminded him of the dirt found in Tennyson's bed. However, investigators were unable to match the dirt from the boots to the dirt found in the bed.

¶8.     Authorities obtained a search warrant for Tennyson's phone and extracted the phone's data. Relevant to the case were the messages between House and Tennyson leading up to Tennyson's death. Between 7:42 p.m. and 10:33 p.m. on June 19, 2023, House and Tennyson exchanged several messages. The messages suggest that Tennyson tried to bring Gabe and Grayson over to see House, but he was not answering his phone. House and Tennyson accused each other of cheating during their romantic relationship. After texting back and forth about the cheating, Tennyson wrote, "I am done talking to a liar that never was home and I drove all the way because [his] son wanted to see him a minute for nothing

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

5

but it's all good."  House and Tennyson then exchanged the following messages between 9:51 p.m. and 10:33 p.m.:

Tennyson:    Stop riding by my house

Tennyson:    Don't say u didn't i just seen you ride by now stop riding by

House:        You think you can just do this to me with my kids there

House:        Not this time

Tennyson:    Stop riding by my house and I mean it

House:        Game over

Tennyson:    U need some help

House:        You could have just done that along [sic] time ago and I'll stop!!!

House:        You owe me that dam Danielle

House:        I know your doing all this for somebody else not me I've been with you for 8 years and you've never tried doing this for me but just tell me don't keep doing me this way I know you hate me and ok with that but I'm not a bad man you don't half to call me while your fuckin somebody dam you've hurt me enough just plz let me go

House:        I know yall want a better life and doing all this will get you there and that's ok Danielle you make me think you love me and I've gotta big heart you already know that why it hurts me so bad but you deserve better and so do they it's not all about use but this is the last time I will texting you I'm going to get help from brother Jerry I have nothing left but them boys...

House:        One day you realize you had a good man..but I didn't have enough dick for you..but don't let these other men take away from your kids

House:        What is happiness

6

¶9.     The Lowndes County Sheriff's Department obtained a warrant for the location data associated with House's Gmail account. Gabrielle Raines, a custodian of records for Google, testified and authenticated the subscriber information associated with House's Gmail account as well as the report generated by Google detailing House's location data for June 19 and 20, 2023. Captain McCain mapped the location data provided by Google. McCain's work provided a visual representation of the timeline of House's movements on June 19 and 20. Based on the location data, House traveled north from Columbus to Caledonia and was in the vicinity of Tennyson's home when she was texting him to stop riding by her house. Around 10:45 p.m., the location data showed House start to head back south toward Columbus. A tag reader marked his vehicle headed south toward Columbus at 11:06 p.m. By 12:25 a.m., the location data showed that House was at his home. Between 12:25 a.m. and 12:51 a.m., location data showed that House traveled north back to Caledonia. The location at 12:51 a.m. appears to be very close to or at Tennyson's home. At that point, House stopped transmitting location data, indicating that his phone had been turned off. At 3:42 a.m., it began to transmit location data again. His vehicle passed the same tag reader headed south at 3:40 a.m.. By 3:56 a.m., the data showed that he was back at home.

¶10.    During the course of the investigation, Captain McCain received information that a police report had been filed against House on June 20, 2023, in Ecru. McCain dispatched Sergeant Scott Glasgow to Ecru to obtain the incident report and 911 recordings. Joseph House, House's younger brother filed the report. According to Joseph, on the morning of June 20 between 6:30 and 6:35 a.m., he stopped at Jeff's Quick Stop—a convenience store

7

and gas station located near his work. Joseph looked down to pick up some change and when he looked up, House was next to his vehicle. House got inside Joseph's truck with a gun. Joseph testified that the gun "looked like a Glock .9 millimeter[.]" Joseph said that House wanted him to leave the store and "continued to threaten to blow my brains off." Joseph testified, "He said either you leave this store or I shoot you right here. And he quoted after that statement that I just shot by baby momma with my two boys laying beside her and he continued wanting me to leave. Said we were going to take one last ride[.]" Eventually, House got out of Joseph's vehicle and drove off. Surveillance footage from the convenience store and Google location data confirmed that House drove to the Quick Stop that morning. Joseph went home and called the police to report what happened.

¶11. Captain McCain testified that investigators obtained Tennyson's home internet router, but no devices from outside the home connected to the router during the time frame given for Tennyson's death. Investigators tested House's vehicle for gunshot residue but were unable to collect any evidence. Captain McCain testified that there was a low probability of finding any gunshot residue due to the amount of time that had passed "because gunshot residue . . . typically . . . last[s] . . . fours hours or so roundabout." They also collected DNA from House to compare against any DNA found on Tennyson's body, but there was insufficient DNA found on Tennyson to test.

¶12. On October 25, 2023, a grand jury indicted House for the first degree murder of Tennyson under Mississippi Code Section 97-3-19(1)(a) (Rev. 2020). A jury trial took place from November 18 to 20, 2024. The State called fifteen witnesses to testify. After the

presentation of the State's case, House moved for a directed verdict, which the trial judge denied. Following deliberation, the jury found House guilty of first degree murder, and the court sentenced him to life imprisonment. Following the verdict and sentencing, House moved for judgment notwithstanding the verdict or, alternatively, a new trial. Both were denied. House then appealed his conviction and sentence.

## ISSUES PRESENTED

¶13. House raises the following issues on appeal:

I. Whether the State presented sufficient evidence of deliberate design.

II. Whether the verdict was against the overwhelming weight of the evidence.

## DISCUSSION

### I. Sufficiency of the Evidence

¶14. When the Court reviews challenges to the sufficiency of the evidence, the evidence is viewed "in the light most favorable to the prosecution[.]" *Ross v. State*, 288 So. 3d 317, 321-22 (Miss. 2020) (quoting *Portis v. State*, 245 So. 3d 457, 472 (Miss. 2018)). The Court is tasked with determining "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 322 (internal quotation mark omitted) (quoting *Portis*, 245 So. 3d at 472). "[A]ll favorable inferences that may reasonably be drawn from the evidence" inure to the benefit of the State. *Id.* (internal quotation mark omitted) (quoting *Hughes v. State*, 983 So. 2d 270, 276 (Miss. 2008)).

¶15. Section 97-3-19(1)(a) defines first degree murder as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate

9

design to effect the death of the person killed, or of any human being[.]" To prove that House was guilty of first degree murder, the State had to demonstrate deliberate design by House. "'The term "deliberate" means "a full awareness of what one is doing and generally implies careful and unhurried consideration of the consequences."' 'The term "design" "means to calculate, plan or contemplate."' Deliberate design 'may be formed very quickly, and perhaps only moments before the act of consummating the intent.'" *Watts v. State*, 402 So. 3d 744, 749 (Miss. 2025) (citations omitted).

¶16. House argues that the State did not meet its burden to show deliberate design. He emphasizes the circumstantial nature of the case. No weapon was recovered, no DNA or fingerprints tied House to the crime, no gunshot residue was found, and no conclusive evidence established House's location during the estimated time of Tennyson's death. "However, this Court repeatedly has held that 'direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt.'" *Johnson v. State*, 224 So. 3d 66, 68 (Miss. 2016) (quoting *Underwood v. State*, 708 So. 2d 18, 35 (Miss. 1998)).

¶17. Looking to the evidence produced by the State and viewing it in the light most favorable to the prosecution, the State met its burden. The State was able to demonstrate that House and Tennyson argued during the day leading up to her murder through the admission of their text messages as well as testimony and video evidence of their argument at the YMCA. Kayla testified that the door leading from the carport to the kitchen was open and the lock was still engaged when she arrived home. Kayla testified that she had seen House

10

open locked doors using a credit card on previous occasions. House's last known location from the Google data showed that he was very close to Tennyson's house before his phone stopped transmitting data, indicating that it had been turned off. Perhaps most probative were the text messages to Shaffer the next morning and Joseph's testimony about House's alleged confession and that House was carrying a .9 mm gun. Taking all the evidence in the light most favorable to the State, sufficient evidence supported the guilty verdict, and a rational trier of fact could find all the essential elements of first degree murder.

## II. Weight of the Evidence

¶18. Next, House challenges the weight of the evidence. When evaluating a challenge to the weight of the evidence, the Court looks at the evidence in the light most favorable to the verdict. *Burden v. State*, 347 So. 3d 174, 178 (Miss. 2022) (citing *Little v. State*, 233 So. 3d 288, 289 (Miss. 2017)). It will only disturb the verdict if allowing it to stand would sanction an unconscionable injustice. *Id.* (quoting *Little*, 233 So. 3d at 292). As detailed in the previous section, the State presented a plethora of evidence to support House's guilty verdict. House reiterates his argument regarding the lack of direct physical evidence tying him to the crime. We reiterate that there is no higher burden of proof in a case of circumstantial evidence. *Nevels v. State*, 325 So. 3d 627, 631 (Miss. 2021). It is the role of the jury to weigh the evidence and determine if the defendant is guilty beyond a reasonable doubt. *Archie v. State*, 387 So. 3d 963, 976 (Miss. 2024) (quoting *Willis v. State*, 352 So. 3d 602, 614 (Miss. 2022)). The jury deliberated and determined that House was guilty beyond a reasonable doubt even absent direct physical evidence. Given the amount of

11

circumstantial evidence presented by the State, the verdict was not against the weight of the evidence.

## CONCLUSION

¶19. The Court concludes that the State presented sufficient evidence of House's guilt and that the verdict was not against the weight of the evidence. Therefore, we affirm House's conviction and sentence.

¶20. **AFFIRMED.**

**RANDOLPH, C.J., KING, P.J., ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**